UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:09-cv-00020-TBR

MCI COMMUNICATIONS SERVICES,
INC., a Delaware Corporation,

                                                                    PLAINTIFF

       v.

JOHN CLARK, JR. d/b/a CLARK
EXCAVATING,                                                     DEFENDANT

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING LOSS OF USE DAMAGES

       Plaintiff MCI Communications Services, Inc. ("MCI") submits this memorandum in

opposition to motion of Defendant John Clark, Jr. d/b/a Clark Excavating ("Clark") for partial

summary judgment (Docket Entry ("D.E.") 32) regarding MCI's loss of use damages.

## INTRODUCTION

       On August 15, 2007, Clark severed MCI's underground fiber-optic telecommunications

cable (the "Cable").  MCI suffered actual damages of $869,525.73, consisting of:  (1) repair

costs of $75,520.00; and (2) $791,005.73 for the loss of the use of the Cable.  MCI has measured

its loss of use damages by the cost of obtaining capacity from another carrier sufficient to replace

the capacity of transport systems that were active and impacted when Clark severed the Cable,

i.e., the rental cost of substitute or replacement property.

       Clark does not dispute that MCI lost the use of the Cable.  Clark, nonetheless, seeks

summary judgment that MCI is not entitled to loss of use damages because: (1) MCI purportedly

suffered  no  interruption  in  service  due  to  redundancy  MCI  built  into  its  system;  and

(2) compensating MCI damages for its loss of the use of the Cable would somehow result in a "windfall" to MCI.

Clark's argument is contrary to the evidence which shows that Clark's severance of the Cable did, indeed, cause an interruption in service.  It is also contrary to Kentucky law which specifically allows damages for the loss of the use of a telecommunications cable.  Finally, denying MCI loss of use damages because it was able to protect the public by rerouting a portion of the traffic from the Cable after Clark severed it to dedicated, spare restoration capacity on other cables in MCI's network which MCI built at a cost of millions of dollars and reserves exclusively for use in emergencies would result in windfall to Clark and would discourage telecommunications companies from taking the actions necessary to protect the public in the future.

## STATEMENT OF MATERIAL FACTS WHICH PRECLUDE SUMMARY JUDGMENT

1.      This cut had a severe impact on both the public and on MCI's network.  Over 45,000 switched calls were blocked.  MCI received complaints from at least 137 separate customers, many of whom had multiple circuits, whose dedicated service was completely interrupted.[1]  MCI has also identified an additional 172 customers, many of whom also had multiple circuits, whose dedicated service was also completely interrupted.  Tooley Declaration (Ex. 1) at ¶ 31.

2.      Because of the nature of MCI's business and the Cable's vulnerability to damage like that Clark inflicted here, MCI has, at a cost of millions of dollars, built dedicated, spare restoration capacity into its network which it attempts to use in cases like this to reroute traffic.  Tooley Declaration (Ex. 1) at ¶¶ 20-25, 36-37, 46-50, 52-60.

---

[1] A switched call is what is commonly known as "POTS" or "plain old telephone service" in which the caller dials "1" plus the area code and the telephone number to make a call.  Dedicated service, on the other hand, is a direct connection between two separate locations.  Tooley Declaration (Ex. 1) at ¶ 48.

3.      MCI reserves this dedicated, spare restoration capacity exclusively for use in emergencies and does not use it for the general purposes of its business.  Tooley Declaration (Ex. 1) at ¶¶ 50-51; Tooley Dep. (relevant portions attached as Ex. 2) at 34:16-24, 41:18-42:23.

4.      While MCI was able to reroute a portion of the traffic from the Cable after Clark severed it, that traffic was still impacted.  MCI's customers no longer had the protection they had been promised and that traffic was in jeopardy of being completely interrupted if there was a cut on the restoration path.  Tooley Declaration (Ex. 1) at ¶¶ 36-37.

## FACTUAL BACKGROUND

## I.      THE CABLE CLARK SEVERED

A fiber-optic cable is essentially a "pipeline" that carries telecommunications traffic between various points in a telecommunications carrier's network known as terminals.  It consists of individual strands of glass or "fibers" which are connected to electronic equipment in the terminals.  The capacity of a fiber-optic cable is measured by a unit known as a "DS-3."  The DS-3 is the common denominator used throughout the telecommunications industry as a measure of capacity.  MCI, LLC v. Patriot Engineering and Environmental, Inc., 487 F. Supp. 2d 1029, 1032 (S.D. Ind. 2007); MCI WorldCom Network Services, Inc. v Pelcrete Constr. Inc., 2006 WL 1388490 at 2 n.1 (S.D.N.Y. May 8, 2006); In re New Part 4 of the Commission's Rules Concerning Disruptions to Communications, FCC 04-188, ET Docket No. 04-35, Report and Order (Aug. 19, 2004) ("FCC Order") (relevant portions attached as Ex. 3) at ¶ 128; Tooley Declaration (Ex. 1) at ¶¶ 26-27, 38, 45; Tooley Dep. (Ex. 2) at 25:11-19.[2]

The Federal Communications Commission ("FCC") has described the DS-3 as "a communications highway," put in place to provide services essential to Homeland Security and

---

[2] A DS-3 is an electrical circuit which has a bit stream or data rate of approximately 44.7 megabits per second.  One DS-3 is the equivalent of 672 individual phone calls.  Patriot, 487 F. Supp. 2d at 1032; Pelcrete, 2006 WL 1388490 at 2 n.1; FCC Order (Ex. 3) at ¶ 128 & n.353; Tooley Declaration (Ex. 1) at ¶ 26.

our Nation's economy by carrying traffic ranging from simple alarm and control circuits to voice circuits, to radio and television programs, to circuits carrying ATM or credit card transactions, to FAA flight control circuits, to Department of Defense circuits, to transferring billions of dollars from one Federal Reserve Bank to another, and to circuits critical to the operation of the stock and bond markets.  Id. at ¶¶ 8, 127, 136.  These telecommunications services are essential to the operation of virtually all government, business and critical infrastructures throughout the United States as well as our Nation's economy.  Id. at ¶ 11.

## II.   THE IMPACT OF CLARK'S SEVERANCE OF THE CABLE

When Clark severed it, the Cable had 28 transport systems[3] that were provisioned, active and being used.  Those transport systems had a total capacity of 2,976 DS-3s.  All 28 transport systems, and all 2,976 DS-3s of capacity on those transport systems, were impacted by Clark's severance of the Cable.   Tooley Declaration (Ex. 1) at ¶¶ 29-30; Tooley Dep. (Ex. 2) at 24:18-26:10, 34:9-15, 41:10-17.

While MCI was able to reroute a portion of traffic from the severed Cable to dedicated, spare restoration capacity on other cables in MCI's own network which was reserved exclusively for use in emergencies situations such as cable cuts, a significant amount of traffic was completely interrupted or "down hard."  Over 45,000 switched calls were blocked.  At least 309 separate customers, many of whom had multiple circuits, had their dedicated service completely interrupted.  Tooley Declaration (Ex. 1) at ¶ 31.

---

[3] DS-3 circuits are carried by optical carrier or transport systems that are denominated as OC-48, OC-192, etc.  The transport systems convert the electrical signal from the DS-3 to an optical signal which is then transmitted through a fiber-optic cable via light waves.  The number following the "OC" indicates the capacity of the transport system. Thus, an "OC-48" transport system has a capacity of 48 DS-3s.  An "OC-192" transport system has a capacity of 192 DS-3s.  The capacity of the transport systems is based on the equipment in the terminals at the ends of the cable. Patriot, 487 F. Supp. 2d at 1032; Tooley Declaration (Ex. 1) at ¶¶ 27-28.

While not "down hard," the portion of the traffic MCI was able to reroute was still impacted. MCI's customers no longer had the back-up security they had been promised. That traffic was at risk of being completely lost if MCI suffered a cut on the restoration path before the Cable was repaired. Id. at ¶¶ 36-37, 47.[4]

## III.   THE COST OF MCI'S DEDICATED SPARE RESTORATION CAPACITY

Eleven of the 28 transport systems that were active and impacted by Clark's severance of the Cable were configured in ring or 1+1 protections systems and had dedicated, spare restoration paths on other cables which were available when Clark severed the Cable. This allowed MCI to reroute traffic from those 11 systems at a "light" or "system" level. These 11 systems had a total capacity of 1,680 DS-3s. Id. at ¶ 53. In order to have these ring and 1+1 protection systems, MCI had to construct and equip a network of twice the cables and/or capacity MCI would otherwise need. The cost of the equipment necessary to operate the dedicated, spare restoration capacity for the those 11 ring systems was approximately $12,418,560.00. Id. at ¶¶ 54-56.

In addition to the dedicated, spare restoration capacity on other cables to which MCI rerouted traffic at a system level, MCI also used dedicated, spare restoration capacity on other cables to reroute an additional 434 DS-3s of traffic at the DS-3 level. The cost for the dedicated restoration capacity MCI used to reroute this additional 434 DS-3s of traffic was approximately $3,797,500.00. This makes the total cost of just the equipment necessary to operate the dedicated, spare restoration capacity MCI used to reroute a portion of the traffic from the Cable $16,216,060.00. Id. at ¶¶ 57-60.

---

[4] Two of the transport systems that were active on the Cable when Clark severed it were, in fact, initially switched to a dedicated restoration path on a separate cable. However, the cable on which those dedicated restoration paths were routed was subsequently severed in another cable cut. All traffic on those two systems, which had been rerouted to the dedicated, redundant restoration paths, was then completely interrupted. Id. at ¶ 36.

IV.     **THE NEED FOR MCI TO PROTECT THE PUBLIC WITH ITS OWN DEDICATED SPARE RESTORATION CAPACITY**

Congress has found that unintentional damage to underground facilities during excavation is a significant cause of disruptions in telecommunications and other vital public services such as hospitals and air traffic control operations.  MCI WORLDCOM Network Services, Inc. v. Big John's Sewer Contractors, Inc., 2003 WL 22532804 (N.D. Ill. Nov. 7, 2003); Pub. L. 105-178, Title VII, § 7301, June 9, 1998, 112 Stat. 477, 49 U.S.C.A. § 6101, Historical and Statutory Notes.  Excavation damage is, in fact, the single largest cause of interruptions to fiber cable service.  National Transportation Safety Board, Safety Study: Protecting Public Safety Through Excavation Damage Prevention, (Dec. 1997) (the "NTSB Safety Study") (relevant portions attached as Ex. 4) at 2; see Tooley Declaration (Ex. 1) at ¶¶ 19, 21-22.

Network reliability data compiled since 1993 shows that more than half of all facility outages are the result of excavation damage.  A Federal Aviation Administration (FAA) study of cable cuts in 1993 documented 1,444 equipment outages or communications service disruptions resulting from 590 cable cuts nationwide over a 2-year period.  The majority of cable cuts were related to construction and excavation activities.  In 1995, cable cuts affected 32 air traffic control facilities, including five en route control centers.  Cable cuts for the first 8 months of 1997 affected air traffic control operations for a total of 158 hours.  NTSB Safety Study (Ex. 4) at 3; see Tooley Declaration (Ex. 1) at ¶ 23.

A study performed by the Telecommunications Industry Benchmarking Consortium ("TIBC") at the behest of the Federal Communications Commission's Network Reliability Counsel found that it is often less expensive for an excavator simply to dig up telecommunications facilities and pay the price than it is to excavate safely.  TIBC Network

Protection Practices for Subsurface Facilities (June 1994) (the "TIBC Study") (relevant portions

attached as Ex. 5) at 56-57; see Tooley Declaration (Ex. 1) at ¶¶ 19, 24.  The study concluded

that third-party damage to underground utilities will not be significantly reduced until the

fundamental economics are changed and that certain excavators under pressure to earn a profit

will continue to dig up facilities if it is the least expensive course of action open to them.  TIBC

Study (Ex. 5) at 60; see Tooley Declaration (Ex. 1) at ¶ 25.

The record here evidences the prescience of these studies.   While Clark did call

Kentucky 811 before he began digging,[5] Clark, by his own surveyor's investigation, severed the

cable over 800 feet beyond the area of proposed excavation he had provided to Kentucky 811.

Survey (Ex. 6); see Melton Dep. (relevant portions attached as Ex. 7) at 10:4-15:21; MCI

Interrog. Ans. (Ex. 8) at No. 12.   There were MCI permanent marker poles in the area where

Clark was digging when he severed the Cable.  MCI Interrog. Ans. (Ex. 8) at Nos. 3, 7, 9.  These

signs warned of the Cable's presence.   They also contained the phone number not only for

Kentucky 811, but also for MCI itself.  Clark has; admitted that he saw a permanent marker sign

and knew there was a fiber-optic cable in the area before he began digging.  Clark Dep. (relevant

portions attached as Ex. 9) at 19:10:-20:4.   Despite seeing this marker sign, Clark went ahead

and dug.  Id. at 33:5-13.   Indeed, Clark kept digging even after dug up the Cable.  Id. at

37:21-38:9.

## V.      MCI'S LOSS OF USE CALCULATION

MCI has based its loss of use damages on the cost of obtaining comparable capacity from

another carrier sufficient to replace the 2,976 DS-3s of capacity of only the 28 transport systems

that were provisioned, active, and impacted when Clark severed the Cable.  In other words, MCI

---

[5] Kentucky 811 is the "one-call" protection notification center  or "One-Call center" formed to receive the notices of excavation required by the Kentucky Underground Facility Damage Prevention Act of 1994, K.R.S. §§ 367.4901 to 367.4917 (the "Damage Prevention Act").

based its loss of use damages on the cost of renting substitute or replacement property. Tooley Declaration (Ex. 1) at ¶¶ 29-30, 38-44.

This is the same methodology used throughout the telecommunications industry to calculate loss of use damages. Tooley Declaration (Ex. 1) at ¶ 45. It is a methodology courts have found provides a reasonable basis for calculating damages for loss of use of a telecommunications cable. E.g., MCI WORLDCOM Network Services, Inc. v. Atlas Excavating, Inc., 2006 WL 3542332 at 5-9 (N.D. Ill. Dec. 6, 2006); Pelcrete, 2006 WL 1388490 at 1-2; MCI WORLDCOM Network Services, Inc. v. Kramer Tree Specialists, Inc., 2003 WL 22139791 at 1-2 (N.D. Ill. Aug. 15, 2003) ("Kramer II"); see Tooley Declaration (Ex. 1) at ¶¶ 18, 38. As set forth hereinbelow, it is a proper methodology for measuring damages for the loss of use of property under Kentucky law.

## ARGUMENTS AND AUTHORITIES

## I.   CLARK'S SEVERANCE OF THE CABLE DID CAUSE AN INTERRUPTION IN SERVICE

The key premise of Clark's argument and of the cases on which Clark relies is Clark's assertion, unsupported by any evidence, that its severance of the Cable purportedly did not cause an interruption in service. Clark Memorandum (D.E. 32-1) at 21.[6]  The evidence MCI has submitted shows that contrary to Clark's assertion, Clark's severance of the Cable caused a significant interruption in service. Over 45,000 switched calls were blocked. MCI received complaints from 137 separate customers, many of whom had multiple circuits, that their dedicated service was completely interrupted. MCI also identified an additional 172 customers,

---

[6] "In light of the overwhelming case law that prohibits recovery for loss of use damages when **the telecommunications carrier suffers no interruption of service due to the redundancy built into its own systems …** Verizon should be prohibited for [sic] recovery on its loss of use claim." Id. (emphasis added).

many of whom also had multiple circuits, whose service was also completely interrupted. Clark's motion is thus founded on a false premise and should be denied.

## II.   KENTUCKY LAW ALLOWS RECOVERY OF DAMAGES FOR THE LOSS OF THE USE OF A TELECOMMUNICATIONS CABLE

Clark claims that damages for the loss of the use of a telecommunications cable is purportedly "a fairly new development by MCI/MCI to enhance their recovery for fiber optic line damages." Clark Memorandum (D.E. 32-1) at 4. Contrary to Clark's argument, Kentucky's highest court ruled over 90 years ago that the owner of a telephone line that is damaged is entitled to recover not only repair costs, but also damages for the loss of the use of that line. Louisville & N. R. Co. v. Gillespie, 177 S.W. 451, 454 (Ky. 1915).

In Gillespie, the owner of a telephone line sued a railroad which had damaged the telephone line while reconstructing its tracks. The Court of Appeals held that the measure of damages for the destruction of a telephone line was the reasonable cost of replacing the line plus reasonable compensation for the loss of its use while being repaired and restored to use. Id. at 454.

The Court of Appeals specifically addressed the jury instruction the trial court had given regarding damages which read:

> In the event you find for the plaintiff and believe from the evidence that it is practicable to rebuild the telephone line where it was injured or destroyed, if it was injured or destroyed, the measure of plaintiff's damage is the reasonable cost, as shown by the evidence, of replacing the line in the condition it was in before the injury, at the same place or approximately the same place ... .

Id. at 453. The Court of Appeals held that this instruction did not properly state the law and that the instruction should have been worded as follows:

> In the event you find for the plaintiff and believe from the evidence that it is practicable to rebuild the telephone line where it was injured or destroyed, if it was injured or destroyed, the measure of plaintiff's damage is the reasonable cost, as shown by the evidence, of replacing the line in the condition it was in before

the injury, at the same place or approximately the same place; and such further sum, if any, as you may believe from the evidence will reasonably compensate plaintiff for the loss, if any, of the value of the use to him of the telephone line from the date its use was stopped by defendant's servants at Tunnel Hill or in Berry, until such time as the line could or might, by reasonable diligence or dispatch [sic], be so rebuilt as to be restored to use.

Id. at 454 (emphasis added).  Kentucky law thus entitles MCI to recover damages for the loss of the use of the Cable for the reasonable time it took MCI to repair the Cable and restore it to use.

## III.   THE METHODOLOGY MCI HAS USED TO MEASURE ITS LOSS OF USE DAMAGE IS PROPER UNDER KENTUCKY LAW

### A.   The Rental Cost of Substitute Property Is a Proper Measure Of Loss Of Use Damages Under Kentucky Law

Kentucky courts have treated telephone lines as real property for the purpose of measuring damages.  Kentucky Utils. Co. v. Consolidated Tel. Co., 252 S.W.2d 437, 441 (Ky. 1952).  Kentucky courts have looked to the Restatement (Second) of Torts, § 929, to determine the appropriate measure of damages for harm to real property and improvements thereto.  See, e.g., Newsome v. Billips, 671 S.W.2d 252, 255 (Ky. App. 1984).  Section 929 provides:

(1)  If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction in value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm or, at his election in the appropriate case, the cost of restoration that has been reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

Restatement (Second) of Torts § 929 (emphasis added).

The elements to be considered in determining the value of the lost use are set forth in § 931.  Restatement (Second) of Torts § 929, cmt. d.  Section 931 provides that damages for loss of use of land or chattels include compensation for "the value of the use during the period of . . .

prevention or the value of the use of or the amount paid for a substitute, . . . ."  Comment b to § 931 provides:  "The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, <u>at least the rental value</u> of the chattel or land during the period of deprivation.  <u>This is true even though the owner in fact</u> has suffered no harm through the deprivation, as when he was not using the subject matter at the time or <u>had a substitute that he used without additional expense to him</u>."  (Emphasis added).  Comment c to § 931 provides:

> If a person has been deprived of a chattel or land that was being used in a business that would suffer from the deprivation, the rule for avoidable consequences . . . requires that he should make reasonable efforts to procure a substitute to prevent the harm.  <u>If he uses a substitute of his own, he is entitled to its reasonable rental value in substitution for the rental value of that of which he was deprived</u>. . . .

(Emphasis added); <u>see</u> <u>also</u> 17 Am. Jur. 2d <u>Damages</u>, §§ 444, 448; <u>cf.</u> <u>Pope's Adm'r v. Terrill</u>, 214 S.W.2d 276, 277-78 (Ky. 1948) (reasonable rental value is relevant factor in determining the value of the loss of use of a commercial vehicle).[7]

---

[7] The result would be the same even if the cable were considered personal, rather than real, property.  In <u>Louisville & I. R. Co. v. Schuester</u>, 209 S.W. 542 (Ky. 1919), the Court found that loss of use damages are available to a plaintiff deprived of his personal property by negligence or wrongful act, but that such damages must be specially pleaded.  <u>Id.</u> at 545.  The Court then upheld the jury's award of damages for the reasonable rental value of the plaintiff's truck until a new one could be obtained.  <u>Id.</u>

In <u>Pope's Adm'r</u> the Court addressed the availability of loss of use damages where the plaintiff did not hire a replacement during the repair period.  The Court stated that "[i]t is generally held that such failure does not preclude recovery, although the good faith intention of actually using, or the character of such intended use, may affect the amount of recovery."  214 S.W.2d at 278 (<u>citing</u> 25 C.J.S. <u>Damages</u> § 41; 15 Am. Jur. <u>Damages</u> §§ 129, 132; Annotation, <u>Measure of Damages for Destruction of or Injury to a Commercial Vehicle</u>, 4 A.L.R. 1350, 1355 (1919); Annotation, <u>Measure of Damages for Destruction of or Injury to a Commercial Vehicle</u>, 169 A.L.R. 1074,1087 (1947)).  The Court went on to hold that even though the plaintiff did not rent a substitute during the reasonable time it took to repair his damaged truck, the plaintiff was entitled to loss of use damages based on the rental value of a replacement for the time plaintiff was deprived of its use.  <u>Id.</u>

**B.      Under Kentucky Law The Fact MCI Used Its A Cable It Already Owned To Reroute A Portion Of The Traffic From The Cable Clark Severed Rather Than Renting A Substitute From Another Carrier Does Not Negate MCI's Right To Recover Loss Of Use Damages**

Clark posits that MCI should not be allowed to recover loss of use damages because it was able to reroute all traffic from the Cable to redundant capacity MCI had built into other cables in its own system.  Clark's assertion is both factually and legally wrong.

Contrary to Clark's assertion, the evidence MCI has submitted shows it was not able to reroute all traffic that was being carried on the Cable when Clark severed it.  A significant portion of that traffic was completely interrupted, i.e. "down hard," until MCI repaired the Cable.

Moreover, Kentucky law does not require MCI to have rented substitute capacity from another carrier after Clark severed the Cable to be entitled to loss of use damages.  As set forth above, Kentucky follows the Restatement of Torts (Second) and treats a telecommunications cable as real property for the purpose of determining damages.  The Restatement sections covering damages to real property provide that an injured party is entitled to the rental value of a substitute, even if he uses his own substitute rather than obtaining one from another party. Restatement (Second) of Torts §§ 929, 931 and cmts. b & c to § 931.

Finally, the fact that MCI was able to reroute a portion of the traffic being carried on the Cable after Clark severed it to dedicated, spare restoration capacity on other cables which MCI maintains exclusively for use in emergencies does not change the crucial fact – MCI still lost the use of the cable Clark severed.  Both the FCC and courts have recognized that the protection afforded by having both a working cable and a separate, spare protect route on a different cable has a value in and of itself and is compromised when the main cable is cut, even if customer traffic is not interrupted.

In its August 19, 2004 Report and Order, the FCC determined that a cable cut like that at issue here has a significant impact on the Nation's vital telecommunications infrastructure which continues until the cable is repaired, even though traffic carried on that cable switches to protect paths within seconds.  See FCC Order (Ex. 3) at ¶¶ 127, 134, 136.  "When a DS-3 is a part of a protection scheme such as a SONET ring, it will frequently switch to a protect-path within seconds of a failure in the primary path.  The communications services being provided over the DS-3 will not be immediately affected, but they will no longer be protected."  Id. at ¶ 134 (emphasis in original).[8]  The facts here prove the validity of the FCC's conclusion.  Traffic on two systems that was initially rerouted to a protect path was completely interrupted when MCI suffered a cut on the protect path before it could repair the primary path Clark had severed.

In Atlas, MCI sought loss of use damages based on the cost of leasing substitute capacity from another carrier even though it had rerouted traffic to other cables and capacity in its own network.  The defendant argued that because there was no evidence that MCI's customers were affected, and MCI was not forced to rent alternative capacity from another carrier, awarding loss of use damages would result in an improper windfall to MCI.   2006 WL 3542332 at 6.  The defendant further argued that even if MCI were entitled to recover loss of use damages, the rental value of a substitute cable or capacity was not the proper measure of those damages.  Id. at 8.  As MCI has done here, MCI submitted evidence that it used the redundant capacity on other cables to which it rerouted traffic following the severance of the cable emergency purposes only, and not in its general business.  Id. at 7.  The Court held that MCI's redundant capacity had inherent value of its own – a guarantee of seamless service in the event of an emergency.  The Court then

---

[8] The FCC has analogized this circumstance to a twin-engine airplane which can still fly with one engine.  "If one engine fails, the second (protection) engine keeps the plane flying but in an impaired state.  Service is not restored to normal until both engines operate properly.  Protected communications services are not restored to normal until both the primary and protect DS3s are operate properly."  FCC Order (Ex. 3) at ¶ 134.

held that MCI was entitled to recover loss of use damages based on the reasonable rental cost to replace the active capacity of the cable Atlas severed.  2006 WL 3542332 at 9;  see also Sprint Communications Co. v. Western Innovations, Inc., 618 F. Supp. 2d 1101, 1119-20 (D. Ariz. 2009);[9] Level 3 Communications, LLC v. Toomer Elec. Co., 557 F. Supp. 2d 745, 747 (E.D. La. 2008) (refusing to allow the defendant to reduce its own liability by relying upon the increased level of preparedness in which the plaintiff chose to invest for its business); Kramer II, 2003 WL 22139791 at 2 ("MCI should not be penalized for having a separate infrastructure in place to respond to emergency situations.").

### C.   Kentucky Law Does Not Require MCI To Show Lost Profits Before Being Entitled To Damages For Loss Of The Use Of The Cable

Clark states that MCI did not list any lost profits in its responses to interrogatories regarding damages.  Clark Memorandum (D.E. 32-1 at 3).  Clark, however, has not cited any case applying Kentucky law in which a court held that the plaintiff was required to show lost profits before being entitled to loss of use damages.

Moreover, Kentucky treats telecommunications lines as real property and follows the Restatement (Second) of Torts regarding damages for the loss of use of real property.  See Kentucky Utils. Co, 252 S.W.2d at 441; Newsome, 671 S.W.2d at 255.  The Restatement rules do not require a party to show lost profits before being entitled to loss of use damages.  See Restatement (Second) of Torts §  931 and cmts. b & c to § 931.  The fact MCI is not seeking lost profits is therefore irrelevant.  Cf. Western, 618 F. Supp. 2d at 1119-20 (finding that Arizona,

---

[9] In Western, Sprint sought to measure its loss of use damages by the rental cost of a replacement cable or capacity even though it did not incur any costs to rent substitute capacity on another carrier's cable while it repaired the cable the defendants damaged.  The defendants sought summary judgment that Sprint was not entitled loss of use damages because Sprint rerouted traffic through other cables in its own network and did not suffer any interruption in service.  The Court held that the rental cost of replacement capacity was the appropriate measure of Sprint's loss of use damages and that Sprint would be entitled to such damages as long as it could show that it reserved the capacity to which it rerouted traffic for use in emergencies.  618 F. Supp. 2d at 1119-20.

too, follows the Restatement (Second) of Torts and holding that Sprint was entitled to loss of use damages if it used spare capacity that it reserved for use in emergencies to reroute traffic and that rental value was the appropriate measure of Sprint's loss of use damages).

**IV.     THE MAJORITY OF JURISDICTIONS WHICH HAVE ADDRESSED THE ISSUE HAVE ALLOWED A TELECOMMUNICATIONS CARRIER TO RECOVER LOSS OF USE DAMAGES EVEN THOUGH IT DID NOT OBTAIN SUBSTITUTE CAPACITY FROM ANOTHER CARRIER OR OFFER ANY EVIDENCE OF LOST PROFITS**

Clark claims that the issue of damages for loss of use of a telecommunications line "has been addressed in other courts and has overwhelmingly been rejected."  Clark Memorandum (D.E. 32-1) at 5.  Clark's claim is problematic on two levels.  First, it ignores the fact that Kentucky courts have held that loss of use is a proper element of damages for injury to a telecommunications line (Gillespie, 177 S.W. at 454) and that the rental value of substitute property is a proper measure of such damages (Kentucky Utils. Co., 252 S.W.2d at 441; Pope's Adm'r, 214 S.W.2d at 277-78; Newsome, 671 S.W.2d at 255).  Second, it is simply wrong.

Contrary to Clark's claim, the majority of other jurisdictions that have addressed the issue have, like the Kentucky Court of Appeals in Gillespie, found that loss of use is a proper measure of damages for injury to a telecommunications cable.  E.g., Western, 618 F. Supp. 2d at 1119-20; Toomer, 557 F. Supp. 2d at 747-48;[10] Patriot, 487 F. Supp. 2d at 1034, 1041; MCI Network

---

[10] In Toomer, Level 3 sought to measure its loss of use damages by the rental cost of a replacement cable or capacity, even though it did not actually expend funds to rent substitute capacity on another carrier's cable while its own cable was being repaired.  557 F. Supp. 2d at 746-47.  The defendants argued that because Level 3 was able to reroute all traffic from the damaged cable onto another cable within its own network, Level 3 should not be able to recover loss of use damages based on the rental cost of substitute capacity.  The Court first noted that there was no dispute that Level 3 would have been entitled to recover the actual cost of renting substitute capacity had it actually incurred those costs.  The Court then stated that Level 3 was able to avoid the costs of renting substitute capacity from another carrier only because Level 3 had made the decision to incur the costs of building its own spare capacity for use in emergencies before the incident occurred and that the defendant could not reduce its own liability by relying on the increased level of preparedness in which Level 3 chose to invest for its business.  Id. at 747.  The Court went on to hold that Level 3 could recover loss of use damages for its severed cable notwithstanding that it chose to reroute traffic internally and that the appropriate measure of those damages was the reasonable costs that Level 3 would have expended to rent substitute capacity from another carrier.  Id. at 747-48.

Services, Inc. v. LAI Constr. Services, Inc., Civil No. CCB-05-322 (D. Md. Jan. 3, 2007);[11]

Atlas, 2006 WL 3542332 at 9;[12] Pelcrete, 2006 WL 1388490 at 1-2; [13] Kramer II, 2003 WL

22139791 at 1-2; MCI WORLDCOM Network Services, Inc. v. Kramer Tree Specialists, Inc.,

2003 WL 22139794 at 2 (N.D. Ill. June 19, 2003) ("Kramer I");[14] MCI WORLDCOM Network

Services, Inc. v. OSP Consultants, Inc., 2002 WL 32166536 at 3 (N.D. Okla. Nov. 20, 2002)

("OSP Oklahoma");[15] MCI WORLDCOM Network Services, Inc. v. Von Behren Elec., Inc.,

---

[11] In LAI, MCI and Sprint sought damages for loss of use of a telecommunications cable based on the rental cost of replacement capacity, even though they did not actually rent replacement capacity from another carrier after the incident. LAI sought summary judgment that MCI and Sprint were not entitled to loss of use damages at all, and that even if they were, the rental cost of a substitute cable or capacity was not the proper measure of those damages. LAI claimed that allowing MCI and Sprint to recover loss of use damages when they had rerouted traffic to other cables in their own networks would permit MCI and Sprint to "reap a windfall." The LAI Court noted the dichotomy between the "spare boat" and the "ordinary use of business" theories or concepts. LAI Transcript (relevant portions attached as Ex. 10) at 55-56. The Court then stated the evidence MCI and Sprint submitted raised a question of fact as to whether MCI and Sprint's spare capacity was more like the "spare boat" or "general use" cases which could not be resolved on summary judgment. Id. at 55-58. The Court held that the rental value of substitute property could be an appropriate measure of loss of use damages even if the actual substitute property was not rented and found that whether the cost of substitute property was a reasonable measure of MCI and Sprint's loss of use damages was a question of fact which could not be decided on summary judgment. Id. at 56-58; LAI Docket Sheet (Ex. 11) at 1/3/07 Minute Entry.

[12] In Atlas, MCI sought loss of use damages based on the cost of leasing substitute capacity from another carrier. The defendant argued in a motion for summary judgment that MCI was not entitled to loss of use damages because MCI did not offer any evidence of lost profits and did not actually rent substitute capacity from another carrier. Alternatively, the defendant argued that even if MCI were entitled to recover loss of use damages, the rental value of a substitute cable or capacity was not the proper measure of those damages. 2006 WL 3542332 at 1, 6, 8. The Court denied the defendant's motion and held that MCI was entitled to recover loss of use damages based on the reasonable rental value of the capacity on the transport systems that were provisioned, active and impacted by the severance of the cable. Id. at 9.

[13] In Pelcrete, MCI and Sprint sought damages for loss of use of a cable that had been severed. The Court found that the rental cost of substitute capacity from another carrier was a reasonable basis for calculating MCI and Sprint's loss of use damages and awarded MCI and Sprint loss of use damages based on the rental cost of replacement capacity from another carrier, even though MCI and Sprint did not actually rent replacement capacity from another carrier or offer any evidence of lost profits. 2006 WL 1388490 at 1-2.

[14] In Kramer, MCI sought loss of use damages based on the cost of leasing capacity from another carrier. The defendant sought summary judgment that MCI was not entitled to loss of use damages because it did not actually lease substitute capacity and offered no evidence of lost revenue or business. The Court denied the defendant's motion, holding that the measure of damages was the reasonable rental value of similar property for the period of deprivation and that MCI was not required to actually lease substitute capacity or show a loss of revenue or business to recover loss of use damages. Kramer I, 2003 WL 22139794 at 2-3.

[15] In OSP Oklahoma, both parties sought summary judgment regarding MCI's loss of use damages. 2002 WL 32166536 at 1. MCI argued the reasonable cost of renting a replacement cable or capacity was a proper measure of its loss of use damages. The defendant contended that MCI was not entitled to loss of use damages because MCI did not actually lease a substitute cable. Id. at 3. The Court held that loss of use damages could be measured by the fair rental value of a replacement cable during the period of repairs and that MCI was entitled to loss of use damages even though it did not actually rent substitute property. Id.

2002 WL 32166535 at 2, 7 (N.D. Ga. May 21, 2002);[16] MCI WORLDCOM Network Services, Inc. v. Glendale Excavation Corp., 224 F. Supp. 2d 875, 880-81 (D.N.J. 2002) American Tel. & Tel. Co. v. Connecticut Light & Power Co., 470 F. Supp. 105, 107 (D. Conn. 1979); Ashland Pipeline Co. v. Indiana Bell Tel. Co., 505 N.E.2d 483, 490 (Indiana App. 1987); American Tel. & Tel. Corp. v. Thompson, 227 N.W.2d 7, 8-9 (Neb. 1975); Weleetka Light & Water Co. v. Northrop, 140 P. 1140, 1141 (Okla. 1914); Ohio Bell Tel. Co. v. Buckeye Directional Boring, Case No. 01CVH03-2230, slip op. at 5-7 (Ohio Common Pleas Mar. 14, 2002) (Ex. 12);[17] see 5 D. Dobbs, Law of Remedies: Damages – Equity – Restitution, § 5.15(1) at p. 875 n.13 (2d ed. 1993) ("[Loss of use claims] are appropriate in the case of . . . telephone cables . . .").[18]  Indeed, a number of the cases Clark claims support its position actually support MCI's position.

For example, Clark claims that in Glendale, the Court denied MCI's claim that replacement rental value was a proper measure of MCI's loss of use damages.  Clark Memorandum (D.E. 32-1) at 12-13.  In that case, both MCI and the defendant who severed MCI's cable sought summary judgment regarding the proper measure of MCI's loss of use damages.  224 F. Supp. 2d at 880.  The Court first found that it was "clear" that MCI would most

---

[16] In Von Behren, MCI sought damages for loss of use of a severed cable based on the cost of obtaining replacement capacity, even though it was able to reroute all traffic to other cables in its own network.  The defendant moved to compel MCI to provide information and produce documents concerning any profits or revenues it lost as a result of the fiber cut and also moved for summary judgment on MCI's loss of use claim, arguing that MCI has not suffered any loss of use because MCI had a "ring" system and been able to reroute all the calls to other cables in its own system.  The Court denied both motions, holding that the proper measure of damages for loss of use was the reasonable cost of the like or comparable property and that information regarding lost profits was therefore irrelevant.  2002 WL 32166535 at 2, 7.

[17] In Ohio Bell, the plaintiff sought damages for its loss of the use of an underground cable the defendant had severed.  The defendant argued that the plaintiff was not entitled to loss of use damages because the plaintiff admitted it did not sustain any interruption in service or loss of revenue.  Case No. 01CVH03-2230, slip op. (Ex. 12) at 4.  The Court found that Ohio law was consistent with § 929 of the Restatement (Second) of Torts and held that the plaintiff was entitled to loss of use damages even though if did not sustain any interruption in service or loss of revenue.  Id. at 6.

[18] Kentucky courts have relied on Professor Dobbs' treatise on remedies when pronouncing Kentucky law regarding damages.  See, e.g., Cheyenne Resources, Inc. v. Elk Horn Coal Corp., 265 S.W.3d 184, 186-87 (Ky. 2008); Illinois Valley Asphalt, Inc. v. Harry Berry, Inc., 578 S.W.2d 244, 246 (Ky. 1979); Paducah Area Public Library v. Terry, 655 S.W.2d 19, 25 (Ky. App. 1983).

likely be entitled to loss of use damages.  Id.  While the Court did deny both motions for summary judgment (see id. at 882), it did not as Clark claims, hold that MCI could not measure its loss of use damages by the rental value of replacement property.  Rather, the Court specifically recognized that the rental value of replacement property was one way in which New Jersey law allowed such damages to be measured and simply held that there were questions of fact as to whether the rental cost of replacement property was the correct measure of those damages which could not be resolved on summary judgment.  Id. at 881.

Clark also claims that the Court denied loss of use damages in Patriot.  Clark Memorandum (D.E. 32-1) at 10-12.  In Patriot, the plaintiff, MCI, sought to measure its loss of use damages by the cost to rent replacement fiber-optic capacity from another carrier during the time it took to repair the cable Patriot had severed.  487 F. Supp. 2d at 1031, 1033.  The Court noted that MCI had presented evidence that it built separate, spare dedicated restoration capacity on other cables in its network which it reserved for use in emergencies like Patriot's severance of the main working fiber-optic cable and that this distinguished Patriot from cases like Brode and Lind which had denied loss of use damages.  Id. at 1034 & n.2.[19]  The Court then held that MCI was entitled to recover damages for the loss of the use of the cable Patriot severed and that rental value, while not the only measure, could be a proper measure of rental value.  Id. at 1041.[20]

---

[19] MCI WorldCom Network Services, Inc. v. W.M. Brode Co., 413 F. Supp. 2d 868 (N.D. Ohio 2005) and MCI WorldCom Network Services, Inc. v. Lind, 2003 WL 24304128 (S.D. Fla. Feb 27, 2003).  Brode and Lind are two of the decisions on which Clark also seeks to rely in its Memorandum.  See Clark Memorandum (D.E. 32-1) at 7-8, 16-17.

[20] In Patriot, MCI prorated the monthly recurring portion of the rental cost of substitute capacity on another carrier's cables to only the eight hours of the cut, but sought to include the full one-time installation charge on the theory that cost would be incurred regardless of whether MCI rented that substitute capacity for eight hours or for a year.  The Court held that MCI could not include the one-time installation charge unless it also prorated that charge as it did with the monthly recurring charge.  Id. at 1041.  This is the portion of the Patriot opinion which Clark discusses at length in its Memorandum.  In the present case, however, MCI has prorated both the monthly recurring charge and the one-time installation charge to only the hours the cable Clark severed was out of service and has not sought to include a full one-time installation charge as MCI did in Patriot.  Tooley Declaration (Ex. 1) at ¶¶ 41-43; Tooley

## V.      THE CASES ON WHICH CLARK RELIES ARE BOTH CONTRARY TO KENTUCKY LAW AND FACTUALLY DISTINGUISHABLE

Clark first attempts to rely on Inland Oil & Transport Corp. v. Ashland Oil, Inc., 551 F. Supp. 856 (W.D. Ky. 1982), and Slater v. Texaco, Inc., 506 F. Supp. 1099 (D. Del. 1981). Clark Memorandum (D.E. 32-1 at 4-5).   Inland and Slater were both before the federal court pursuant to its admiralty jurisdiction.   See Inland, 551 F. Supp. at 860; Slater, 506 F. Supp. at 1102.   This case, however,  is before the federal court pursuant to its diversity jurisdiction.   See Complaint (D.E. 1) at ¶¶ 1-4.   Kentucky law, rather than federal admiralty law, therefore provides the rule of law regarding loss of use damages.   See, e.g., Koninklijke Luchtvaart Maatschaapij, N.V. v. United Technologies Corp., 610 F.2d 1052, 1055-57 (2d Cir. 1979) (finding that state law regarding loss of use damages, not federal admiralty law, controlled in a diversity case).   Inland and Slater are, therefore, inapplicable.

Clark also cites decisions from courts in Arkansas, Colorado, Florida, Ohio and Virginia rejecting loss of use damages under the facts presented in those cases and urges this Court to find, based on those decisions, that MCI is not entitled to loss of use damages here.   Clark Memorandum (D.E. 32-1) at 10, 13-17, 19-21.   Those decisions are all contrary to Kentucky law and are also factually distinguishable from the present case.

Kentucky has, for over 90 years, allowed damages for the loss of use of a telecommunications cable.   Gillespie, 177 S.W. at 454.   The cases Clark cites from other jurisdictions are therefore contrary to Kentucky law and should be rejected.   See, e.g., Atlas, 2006 WL 3542332 at 6-8 (distinguishing OSP Virginia[21] and Brode on their facts and finding Lind was contrary to Illinois law); Kramer I, 2003 WL 22139794 at 2 (rejecting the defendant's

---

Dep. (Ex. 2) at 26:22-28:15, 29:18-33:19.  The portion of Patriot on which Clark seeks to rely thus does not apply here.

[21] MCI WorldCom Network Services, Inc. v. OSP Consultants, Inc., 585 S.E.2d 540 (Va. 2003) ("OSP Virginia"). Clark also seeks to rely on OSP Virginia.  Clark Memorandum (D.E. 34-2) at 13-15.

attempt to rely on <u>Lind</u> and <u>OSP Virginia</u> because they were neither binding nor instructive on Illinois law which the Court was bound to follow regarding MCI's entitlement to loss of use damages).

Moreover, the critical facts on which the courts relied to reach their holdings in those cases differ significantly from the evidence MCI has presented here.  In <u>Brode</u>, the Court found that there was, at most, a millisecond or two of service disruption and that there was "no evidence that there was a loss of service or complaints of loss of service from MCI customers as a result of Brode's severance of MCI's cable."  413 F. Supp. 2d  at 869.  The Court further found that the spare cables and/or capacity MCI used to reroute traffic from the cable Brode severed "was used in the ordinary course [of MCI's] business and was not reserved expressly for emergencies."  <u>Id.</u> at 874.  Based on these two critical factual findings, the Court held that "MCI may not recover loss of use damages <u>when no actual of [sic] loss of service occurred.</u>"  <u>Id.</u> (emphasis added).

Here, unlike <u>Brode</u>, MCI has presented evidence of an actual loss of service and complaints from customers about their loss of service.  MCI has offered evidence that it has over 45,000 blocked switched calls and that it received complaints from and/or identified at least 309 customers, many of whom had multiple circuits, whose dedicated service was completely interrupted.   MCI has also offered evidence that it expressly reserved the dedicated spare, restoration capacity on other cables it used to reroute a portion of the traffic from the Cable after Clark severed it for use in emergencies and did not use that dedicated, spare restoration capacity in the ordinary course of its business.  The crucial facts which were the <u>sine qua non</u> of the <u>Brode</u>

Court's decision are thus exactly the opposite of the evidence MCI has presented here.  See Atlas, 2006 WL 3542332 at 7.[22]

In Lind, 2003 WL 24304128, the Court repeatedly emphasized the facts that MCI was able to "instantaneously" reroute all traffic from the severed cable to other cables in MCI's network, and that neither MCI nor its customers experienced any interruption in service.  Id. at 1, 4, 6.  These facts were the basis for the Court's holding that MCI was not entitled to loss of use damages.  Id. at 6.[23]  As with Brode, the Lind holding is thus based on facts directly opposite to the evidence MCI has submitted here.

In OSP Virginia, the Court found MCI was not entitled to loss of use damage because the evidence presented in that case showed that MCI used the excess capacity in its network "primarily for the general use of its business so that it can accommodate varying levels of telecommunications traffic," and did not reserve that excess capacity for use in emergencies. 585 S.E.2d at 544.  The Court, however, specifically limited its holding to "the circumstances of [that] case."  Id. (emphasis added).

Here, unlike OSP Virginia, MCI has submitted evidence that it expressly reserved the dedicated, spare capacity it used to reroute a portion of the traffic from the Cable Clark severed for use in emergencies and did not use those dedicated, spare capacity in the ordinary course of

---

[22] Moreover, Brode is not only contrary to Kentucky law and the Restatement, it also conflicts with other Ohio decisions.  In Ohio Bell, the Court found that Ohio law was consistent with § 929 of the Restatement (Second) of Torts and held that the plaintiff was entitled to loss of use damages even though it did not sustain any interruption in service or loss of revenue.  Slip op. (Ex. 12) at 5-7.

[23] This was also true in MCI WorldCom Network Services, Inc. v. Morris Plumbing and Elec. Co., 2002 WL 33004353 (S.D. Fla. Oct. 23, 2002) and MCI WorldCom Network Services, Inc. v. Mastec, Inc., 995 So.2d 221 (Fla. 2008), the two other Florida decisions Clark discusses at length in its Memorandum.  See Morris, 2002 WL 33004353 at 2; Mastec, 995 So.2d at 222.

its business.  This evidence distinguishes <u>OSP Virginia</u> and makes it inapplicable to the facts

before this Court.  <u>See</u> <u>Atlas</u>, 2006 WL 3542332 at 7.[24]

A number of the cases Clark cites in its Memorandum to support its position rely heavily

on the United States Supreme Court's decision in <u>Brooklyn Eastern Dist. Terminal v. United</u>

<u>States</u>, 287 U.S. 170 (1932).[25]  In <u>Brooklyn Eastern</u>, the Court stated that where the nature of the

business was such that a party needed to keep a spare available to avoid a loss, the fair value of

hiring a substitute could be an element of damage, regardless of whether the substitute was

actually hired.  <u>Brooklyn Eastern</u>, 287 U.S. at 174-75.  The Court further stated that where a

shipowner did, in fact, maintain a spare boat which it kept in reserve to use as a substitute if

another of its vessels was damaged, it was entitled to loss of use damages.  This was true

regardless of whether the shipowner procured the spare boat after the event, or simply used one

he had acquired and maintained as a spare prior to the incident:

> Shipowners at times maintain an extra or spare boat which is kept in reserve for
> the purpose of being utilized as a substitute in the contingency of damage to other
> vessels of the fleet.  There are decisions to the effect that in such conditions the
> value of the use of the boat thus specially reserved may be part of the demurrage.
> If no such boat had been maintained, another might have been hired, and the hire

---

[24] Clark also cites <u>Southwestern Bell Tel. Co. v. Harris Co. of Fort Smith</u>, 109 S.W.3d 637 (Ark. 2003), and <u>PurCo</u>
<u>Fleet Services, Inc. v. Koenig</u>, 2010 WL 185415 (Colo. App. Jan. 21, 2010).  In <u>Southwestern Bell</u>, the Court
repeatedly stated it was denying loss of use damages because Arkansas law does not recognize loss of use damages
for any personal property other than motor vehicles.  <u>Id.</u> at 639-40.  Kentucky law allows loss of use for damage to a
telecommunications cable.  <u>Gillespie</u>, 177 S.W. at 454.  <u>Southwestern Bell</u> is, therefore, inapposite.

Clark's attempted reliance on <u>PurCo</u> is even more tenuous.  First, the plaintiff in <u>PurCo</u> did not, as MCI has done
here, seek to measure its loss of use damages by the rental cost of substitute property, but rather by the gross amount
it would have received from leasing out the property.  The <u>PurCo</u> Court's conclusion that the "lease-out gross rental
value" was not the appropriate measure of damages has no application here.  Second, <u>PurCo</u> is not consistent with
Kentucky decisions which have held that the reasonable rental value of commercial property is a relevant factor in
determining damages for loss of use of business property.  <u>Pope's Adm'r</u>, 214 S.W.2d at 277-78.  Finally, <u>PurCo</u> is
not even consistent with other Colorado decisions which have allowed damages for loss of use of business property
without a showing of lost profits.  <u>Buchanan v. Leonard</u>, 127 F.Supp 120, 122-23 (D. Colo. 1954) (semi tractor cab);
<u>Denver Bldg. & Constr. Trades Council v. Shore</u>, 287 P.2d 267, 273 (Colo. 1955) (heavy construction equipment);
<u>Hillman v. Bray Lines, Inc.</u>, 591 P.2d 1332, 1336 (Colo. App. 1978) (semi truck and trailer).

[25] <u>See</u> <u>Brode</u>, 413 F. Supp. 2d at 873-74; <u>Lind</u>, 2003 WL 24304128 at 3; <u>PurCo</u>, 2010 WL 185415 at *4; <u>Mastec</u>,
995 So.2d at 225 n.2, 227, <u>OSP Virginia</u>, 585 S.E.2d at 544.

charged as an expense.  <u>The result is all one whether the substitute is acquired before the event or after</u>.

<u>Id.</u> at 176-77 (citations omitted) (emphasis added); <u>see</u> <u>Western</u> 618 F. Supp. 2d at 1119 ("[H]aving pre-obtained an emergency back-up was no bar to recovery of loss of use damages.").

The evidence before this Court shows that the nature of MCI's business is such that MCI needs dedicated spare cables and/or capacity to protect the public and to avoid a loss of revenue if one of its cables is damaged.  The evidence further shows that MCI reserved these spare cables and/or capacity exclusively for use in emergencies and did not use them for the general purposes of its business.  These are precisely the facts the <u>Brooklyn Eastern</u> Court found would allow loss of use damages based on the cost of hiring a substitute.  It makes no difference that MCI built the replacement cable path before, rather than waiting until after, Clark severed the Cable.  <u>See</u> <u>Brooklyn Eastern</u>, 287 U.S. at 176-77.  The cases on which Clark seeks to rely are therefore distinguishable from the facts here and should be rejected.

## VI.   DENYING MCI LOSS OF USE DAMAGES BECAUSE IT SPENT MILLIONS OF DOLLARS TO HAVE DEDICATED SPARE RESTORATION CAPACITY ON OTHER CABLES WOULD RESULT IN A WINDFALL TO CLARK

Clark claims that allowing MCI to recover loss of use damages when MCI allegedly did not sustain an interruption in service as a result of Clark's severance of the Cable would somehow allow MCI to obtain a "windfall."  Clark Memorandum (D.E. 31-2) at 4, 21.  Clark's "windfall" argument is contrary to the evidence that MCI and its customers did, in fact, suffer an interruption in service.  Clark's argument also ignores the fact that MCI avoided even greater losses only because it had built dedicated, spare restoration capacity on other cables which it reserved exclusively for use in emergencies and to which it rerouted a portion of the traffic from the Cable after Clark severed it.  MCI expended millions of dollars to protect the public by having this dedicated, spare restoration capacity available.  Both courts and learned

commentators have stated that in such circumstances, the unfairness comes from denying the party damages for loss of use because he used his own property as a substitute rather than procuring substitute property from another.

In The Cayuga, 5 F. Cas. 326 (E.D.N.Y. 1868), aff'd 5 F. Cas. 329 (C.C.E.D.N.Y. 1870), aff'd 81 U.S. 270 (1871), the owners of a ferry sought damages resulting from a collision with the Cayuga.  They did not rent or hire a replacement during the time their ferry was out of service but rather, used another boat they already owned to perform the work of the damaged ferry.  5 F. Cas. at 327.   The district court, nonetheless, awarded the plaintiff loss of use damages.  81 U.S. at 278; 5 F. Cas. at 331.  In affirming, the circuit court gave this rationale for allowing loss of use damages even though the plaintiff used its own spare boat rather than hiring a substitute:

> The [plaintiffs] did not hire, and possibly might have been unable to hire, another ferry-boat to take their place on the ferry.  These very reasons have compelled the [plaintiffs] to build and keep another boat, which they can use when accident or other cause disables one which they have in daily use.
>
> It is quite obvious, that there is neither justice nor equity in allowing to a tort-feasor the benefit of this large outlay made by the [plaintiffs] to enable them to serve the public and run their ferry without interruption; and yet that is the effect of yielding to the argument that, because such spare boat was already in the [plaintiffs'] possession, and was used, therefore the [plaintiffs] sustained no pecuniary loss by the delay... .   The principle of indemnity is uniformly recognized as just, and its measure must be the same, whether a substitute is furnished by the [plaintiff] or procured from another... .   To withhold compensation is, to my mind, obvious injustice.

5 F. Cas. at 331.  In affirming the award of loss of use damages, the Supreme Court adopted the circuit court's reasoning.  81 U.S. at 278; see also The Emma Kate Ross, 50 F. 845, 847 (3d Cir. 1892) ("The [plaintiffs] were entitled to the market value of the services rendered by their substitutes, – regardless of the fact that they might otherwise have been idle.  The vessels

represented a large investment made in preparation for contingencies which might require their services.  Why then should the [defendant] have its use without paying for it?").

In A. Brownstein, <u>What's the Use?  A Doctrinal and Policy Critique of the Measurement of Loss of Use Damages</u>, 37 Rutgers L. Rev. 433 (1985), the author discussed an award of loss of use damages in a case where the plaintiffs operated lightships to guide navigation into a port and kept spare vessels available to ensure that service would not be interrupted:

> The case could have been decided by analogy to the collateral source rule.  The plaintiffs essentially insured themselves against loss at considerable expense by purchasing and maintaining a spare boat.  The defendant should not, therefore, reap the benefits of the plaintiffs' prudence by having the damage recovery reduced by the 'payout' of such self-insurance, the availability of a substitute vehicle to replace the damaged vessels.

<u>Id.</u> at 486.[26]  In his treatise on damages, Professor Dobbs reached the same conclusion:

> Under the spare boat doctrine, if the plaintiff keeps a spare chattel specifically for the purpose of replacing those out of service, he may, after all, recover the cost of the substitute and he is not limited to the wear and tear on the substitute chattel. As Professor Brownstein points out, the plaintiff's maintenance of back-up equipment is a form of self-insurance and the rule allowing full recovery of substitute chattel costs works exactly like the collateral source rule.  The fact that the plaintiff has purchased protection against the defendant's tort by insurance or by back-up equipment does not reduce the damages otherwise recoverable in either case.

5 D. Dobbs, <u>Law of Remedies: Damages – Equity – Restitution</u>, § 5.15(2), p. 880-81 (2d ed. 1993); <u>see</u> <u>also</u> McCormick, <u>Handbook on the Law of Damages</u>, § 124, p. 474 (1935) (denying recovery for the loss of use because the plaintiff did not actually rent substitute property "is untenable").[27]

---

[26] The <u>Toomer</u> Court relied on the collateral source rule in holding that the plaintiff was entitled to loss of use damages even though it rerouted traffic from the damaged cable to redundant capacity it had built into its own network for use in emergencies.  557 F. Supp. 2d at 747-48.

[27] Kentucky courts have also relied on Professor McCormick's treatise on damages when pronouncing Kentucky law.  <u>See</u>, <u>e.g.</u>, <u>Illinois Valley</u>, 578 S.W.2d 244, 246 (Ky. 1979); <u>Paducah Area Public Library</u>, 655 S.W.2d at 25.

Denying MCI loss of use damages would thus result in a windfall to Clark, not MCI, by allowing Clark to impermissibly "reap the benefits of [MCI's] prudence" and work "an obvious injustice" to MCI. See The Cayuga, 81 U.S. at 278, 5 F. Cas. at 331; Brownstein, 37 Rutgers L. Rev. at 486. It would also discourage MCI and similarly situated carriers from investing the millions of dollars necessary to have dedicated, spare restoration capacity available to protect the public in the event of a fiber cut. The Court should not penalize MCI for having a separate infrastructure in place to respond to emergency situations by allowing Clark to reduce its own liability based on the increased level of preparedness in which MCI chose to invest for its business. See, Western, 618 F. Supp. 2d at 1119; Toomer, 557 F. Supp. 2d. at 747; Kramer II, 2003 WL 22139791 at 2.

## CONCLUSION

Clark's motion is contrary to the evidence which shows that Clark's severance of the Cable did, indeed, cause an interruption in service. It is also contrary to Kentucky law which specifically allows damages for the loss of the use of a telecommunications cable. Finally, denying MCI loss of use damages because it was able to protect the public by rerouting a portion of the traffic from the severed Cable to dedicated, spare restoration capacity on other cables in MCI's network which MCI built at a cost of millions of dollars and reserves exclusively for use in emergencies would result in windfall to Clark and would discourage telecommunications companies from taking the actions necessary to protect the public in the future. MCI therefore respectfully requests that the Court deny Clark's motion for summary judgment regarding MCI's loss of use damages.

Respectfully submitted,

    s/ James J. Proszek

James J. Proszek
*jproszek@hallestill.com*
Anthony J. Jorgenson
*ajorgenson@hallestill.com*
Brandon B. Rule
*brule@hallestill.com*
HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706
Telephone: (918) 594-0400
Facsimile:  (981) 594-0505

   and

James A. Sigler
*jsigler@whitlow-law.com*
James R. Coltharp
*jcoltharp@whitlow-law.com*
WHITLOW, ROBERTS, HOUSTON
& STRAUB, PLLC
Old National Bank Building
300 Broadway, P.O. Box 995
Paducah, KY 42002-0995
Telephone: (270) 443-4516
Facsimile:  (270) 443-4571

**ATTORNEYS FOR PLAINTIFF**
**MCI COMMUNICATIONS SERVICES, INC.**

## CERTIFICATE OF MAILING

On the 1st day of March, 2010, I electronically filed this documents through the CM/ECF system, which will send a notice of electronic filing to:

Richard L. Walter
BOEHL, STOPHER & GRAVES, LLP
410 Broadway
Paducah, KY 42001
rwalter@bsgpad.com

    s/ James J. Proszek

1085085.1:915100:02335

27